# CASES

## ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW-JERSEY.

### OCTOBER TERM, 1842.

---

## SAMUEL SHIELDS v. JOHN ARNDT.

The jurisdiction of a court of equity in cases of waste and nuisance, is of a preventive character, and comes in aid of the courts of law. It is founded on the necessity created by irreparable mischief, and the inadequacy of pecuniary compensation.

The diversion of a water-course from its accustomed channel, is a nuisance, which, before the nuisance is created, may and should be restrained by injunction. No mere pecuniary compensation will answer the ends of justice.

The mere denial of the complainant's right by the defendant, in his answer, will not oust this court of its jurisdiction to interfere by injunction.

In cases of doubt, the right should usually be established at law, before the granting of an injunction.

A long enjoyment of a right, will entitle the party to an injunction to restrain a private nuisance, even though the defendant may deny the right; and the court will exercise its discretion whether to order a trial at law or not, before granting an injunction—always inclining, if there be reasonable doubt, to put the case to a jury.

Any particular use of water, or diversion from its accustomed channel for twenty years, undisturbed and uninterrupted, will raise the presumption of a grant.

It seems, too, that as twenty years' possession will give a right, so a nonuser for the like term will put an end to it.

[Shields v. Arndt.]

To constitute a water-course, there must be a stream *usually* flowing in a particular direction, though it need not flow continually.

A hollow or ravine, through which water flows only in times of rain or the melting of snow, is not, in legal contemplation, a water-course.

If a party unlawfully turns a stream of water upon the land of an adjoining proprietor, no right to the water is thereby conferred, and the wrong-doer may divert the water again at any time within twenty years.

The diversion of a stream of water, or any part of it, by a complainant, after the allowance of a writ of injunction in his favor, and before the service of the writ, is an abuse of the process of the court.

Costs disallowed to a successful party, on the grounds that his own unlawful act led to the controversy, and that great and unnecessary expense was occasioned by the examination of numerous witnesses.

THE complainant filed his bill of complaint in this cause against the defendant, on the twenty-first of May, eighteen hundred and thirty-nine, to injoin him from diverting an ancient water-course, which was used and accustomed to flow, in its natural channel, upon the lands of the complainant, contiguous to those of the defendant, about seventy yards along their respective line of lands, and thence to reflow upon the lands of the defendant.

The bill states that the parties reside in Mansfield, Warren county, upon adjacent farms. That at the time of the purchase of the defendant's farm, some years since, there was, and still is, a certain ancient water-course crossing the said farm nearly at right angles at the Spruce Run turnpike road, and always accustomed to flow in a south-western direction entirely across and over the said farm, and in and upon the lands next adjacent, being the complainant's, lying south thereof. That the said ancient water-course was always used and accustomed to flow in its natural channel, by its circuitous route, in and upon the said lands of the complainant, an easterly course, a distance of about seventy yards, to a certain other point in the line of the defendant's lands, whence it reflowed in and upon the defendant's lands, and so continued and flowed, and passed off into the Musconetcong river.

That the complainant had formerly owned and occupied an-

other farm, about half a mile south of the said defendant's farm, which being destitute of water, proved a great inconvenience and loss to the complainant. That in the spring of eighteen hundred and thirty-five, complainant, jointly with one John Strader, jun., purchased the premises adjacent to the farm of the defendant, and known as the Creveling farm, containing about one hundred and twenty-two acres, and lying immediately adjacent, the whole length thereof, from north-east to south-west, and valuable for agriculture and pasturage, and that in October of the same year, the complainant became the sole proprietor of the said farm.

That, having experienced the great inconvenience of cultivating lands destitute of springs and natural water-courses, he was the more anxious to own and occupy the farm in question, chiefly on account of the natural water-course, at that time in full, free, undiminished and uninterrupted flow in and upon that portion thereof above described ; and the better to enjoy those advantages, he purchased other tracts of land to enlarge his said farm the following year—one lot of fifteen acres, and another containing fifty-nine acres ; and in the spring of that year, eighteen hundred and thirty-six, the complainant moved with his family upon, and occupied the said farm and premises, then containing about one hundred and ninety-four acres of land, and there continued until the time of filing his bill of complaint.

That he repaired the mansion, erected a large and commodious barn, wagon-house, and other suitable out-buildings, at considerable cost, and put up long lines of board fences, and others of posts and rails, and laid out his said premises in separate fields, connecting the whole by lanes and fenced avenues, leading directly to the said water-course, herein above described, flowing in its natural and accustomed channel, in a circuitous course, about seventy yards, in and upon a certain portion of the said premises, for the needful accommodation and sustenance of the horses and cattle of the complainant, upon his premises, as a watering place.

That the same is an ancient water-course, and used to flow as designated above, in its old accustomed channel, descending from the mountains, beyond the memory of man, except only a short time disappearing in a sink-hole. That, by reason of ditching along the line of the ancient stream, and the natural flow of waters from its immediate vicinity, the said ancient natural water-course revived and increased, and hath, as ever before, continued to flow on in its ancient, natural and accustomed channel. That its use is wholly indispensable and invaluable to complainant, to be deprived of which, will inevitably impoverish his said farm, subject him to great loss and inconvenience, and render the said plantation comparatively worthless, and all his recent expenditures of accommodation and improvement an idle waste of time and money.

The bill further charges, that the defendant, aware of these premises, and greatly envying the progressive improvement of the complainant's farm, did, for sheer malice, and without any motive of personal advantage or interest, but solely to vex, harass, and injure the complainant in mind and estate, and impede his progress in husbandry, about two years since, cut a ditch about four feet wide at top, and three feet at bottom, and eighteen inches deep, in a straight line along the partition line fence between them, about three feet distant, where the soil was firm and unbroken, a distance of about fifty yards, and nearly parallel with that portion of the said ancient water-course lying upon the complainant's premises immediately adjacent, designated as his watering place aforesaid, and in such position at the extremities of this said ditch that a few hours' labor or an ordinary freshet, would naturally connect the same with the natural course of the said stream and ancient water-course, and thus turn the same wholly upon the lands of defendant, and dry up the complainant's said watering place. That, early in the spring of eighteen hundred and thirty-nine, the freshets broke away the ground at the end of said ditch, and that the water from his said watering place was running into the ditch formed by the defendant; that the complainant thereupon re-

[Shields v. Arndt.]

quested defendant to go down the line of lands with him; he did so, and while there, at the said ditch, he charged defendant with having cut it, with the intent that the water should break into it from the natural stream, and draw the water off from his premises; and that if the defendant did not stop the ditch and turn the water back again, the complainant would be obliged to bring an action against him; whereupon defendant desired complainant would give him time, until the following week, to take counsel, which was refused ; complainant insisting that defendant knew it was a great disadvantage to him, and of no use to defendant, and that he would not have it for thousands of dollars; that the defendant did thereupon stop the waste and turn back the stream by stones, and at the same time informed complainant that he intended to take the water out of the channel at the turnpike road, and lead it out at his (defendant's) house; and complainant forbid him doing so, declaring that if he attempted such a thing he would prosecute him.

That the defendant afterwards commenced digging large drains and ditches upon his said farm, and dammed up the said ancient water-course at the said turnpike road, with the avowed intent and purpose of turning the waters thereof from their accustomed natural channel, upon and across his said farm, leading them to his own house, and diverting them altogether from the watering place of the complainant, and had in fact turned a large proportion thereof out of the natural channel, thereby diminishing the usual and necessary supply of water at complainant's watering place, to his great inconvenience and detriment, and contrary to equity and good conscience, and to the manifest wrong and injury of complainant.

The bill prays an injunction to restrain the defendant, his servants, &c. from diverting any part whatever of the waters of the ancient water-course out of their accustomed channel, and especially from doing any act whereby the ancient watering place upon the complainant's farm may be in any wise affected or injured, and his full enjoyment thereof abridged or impaired ;

and that if they have done any act whereby the same has been in any wise diverted, diminished, injured, or impaired, that they do forthwith return and restore the said waters to their ancient and accustomed channel.

On filing the bill an injunction was ordered to issue, restraining the defendant from doing any act to divert the ancient water-course.

The defendant, by his answer, filed on the fourth day of September, eighteen hundred and thirty-nine, states that he owns a certain farm in the township of Mansfield, in the county of Warren, where he now resides, and has resided since the spring of the year eighteen hundred and thirty-one, and adjoining to a certain other farm, lying southerly of the defendant's, now occupied (and owned as this defendant supposes) by the complainant, and upon which the complainant has made valuable improvements, as in the said bill is set forth.

That when he moved to the farm whereon he now resides, there was no water flowing across and over the same, and upon the lands next adjacent, and lying southerly thereof, except immediately after a rain and upon the melting of the snow; that there was anciently, as defendant has been informed, a small stream flowing from the hills and valleys, and crossing the farms which lie easterly of the defendant's, until it was lost, and entirely disappeared in a sink-hole upon the farm of John and Peter Wyer, which is the third farm easterly from this defendant's, between which and the defendant's farm, lie two others, to wit, Joseph Carter's and Benjamin Reigle's; that after the Morris canal was made, this stream became larger than it formerly was, as this defendant has been informed, and hearing in the summer of eighteen hundred and thirty-two, that his neighbors, the Wyers, Reigle and Carter, above him, were ditching upon their lands, in order to lead the said stream across their farms, he also immediately commenced digging a ditch across his own farm, (which ditch, and the others hereinafter

referred to, are delineated upon a map or draught annexed to the answer, and which he desires may be taken as part thereof;) that when he came to the line between him and the farm now occupied by the complainant, then belonging to the heirs of Creveling, as he understood, being desirous of getting rid of the water at that time, he pushed it through under the fence, whence it found its way along the line, and upon the said adjoining farm, about forty-five yards, when it returned and flowed down upon the defendant's farm, to an ancient watering place, very near said complainant's house, where it formed a considerable pond upon the line between complainant and defendant; that near where this ditch strikes said line fence, between complainant and defendant, there was a low piece of ground, covered with bogs, and grown up with wild grass, which extended a little way upon complainant's farm, and from which, in the spring of the year several small springs issued, some upon defendant's land, and some upon the complainant's; but this defendant has never heard, although he has made particular inquiry, that there was an ancient watering place kept at this spot, nor does he believe there ever was, until the complainant made one there, and to which he has lately made a lane avenue.

That in time of high water, the said ditch would overflow, and the water spread over defendant's land and cover the same, and that solely with a view to prevent this in some measure, and to benefit himself, and not out of mere malice towards the complainant, or to vex, harass and injure him in mind or estate, he dug a shallow ditch along the line upon his own farm, to carry off the surplus water.

Denies that he ever, to his recollection, said that he intended to take the whole of the water out of the channel at the turnpike road, and lead it down to his house.

Admits that he has commenced digging a new ditch from the stream at the turnpike, for the purpose of leading a part of the water to his house, where he has no running water at the door; that he has made small drains from it, to water his mea-

[Shields v. Arndt.]

dows; and that at the house, he intends to discharge the water into the ancient watering place or pond above mentioned, near complainant's house; and in order to turn a part of the water into the said ditch, it became necessary to level the bed of the stream at the turnpike, with the ditch; that accordingly, on the day before the serving of the injunction, a part of the water was running into the new ditch, but before the next Monday, the mouth of the new ditch was stopped by some person or persons unknown to defendant, and the whole of the water turned back into the old ditch; that then the injunction was served on defendant, forbidding him to divert any part whatever of the water.

Insists that the defendant had a perfect right to make the said new ditch and drains, inasmuch as the said stream of water was originally brought upon his premises by ditching from farm to farm, in the manner herein before stated; and inasmuch as there never was, in the recollection of the oldest people in the neighborhood, and as defendant verily believes, any ancient stream of water flowing across his said farm, and upon the farm of the said complainant, except in a time of a freshet, or melting of the snow, as before stated.

The complainant having filed his replication, a large amount of testimony was taken by both parties, principally in regard to the character and duration of the water course, and whether its flow upon the complainant's land was natural or artificial. The cause came on for final hearing at the July term, eighteen hundred and forty-two, upon the pleadings and proofs.

*Hamilton* and *H. W. Green*, for complainant.

*Vroom*, and *I. H. Williamson*, for defendant.

Cases cited by the complainant's counsel: "Angel, 1—5, 33, 42, 50; *Saxton*, 157, 189; 1 *Vesey, sen.* 543; 2 *John. Chan.* 272, 463, 470; *Eden on Inj.* 166; 6 *Vesey*, 707; 3 *Vesey*,

21

[Shields v. Arndt.]

139; *American Jurist*, Oct. 1829, p. 205; 6 *East*. 208; *Saxton*, 187; *Sim.. and Stu*. 190; 5 *Hals*. 78, 80; 3 *Hals*. 149; 3 *Kent's Com*. 439, 441; 4 *Bingham's N. C*. 381.

Cases cited by defendant's counsel: 4 *Mason*, 400; 6 *East*. 214; *Angel*, 74; 1 *Vernon*, 120; *Drewry on Inj*. 237; 16 *Vesey*, 161; 2 *Swans.* 333, 352; 2 *Vesey, sen*. 452; 3 *John. Chan*. 282; *Eden on Inj*. 157, 166, 167, 188; *Hopkins*, 416; 4 *Hen. and Mun.* 474; *Angel*, 174; 3 *Mer*. 688; *Prec. in Chan*. 530; 3 *Mer.* 624, 628.

THE CHANCELLOR. This is a controversy between two very respectable and responsible persons of the county of Warren. It respects the right to water, which the complainant insists should flow to his land, for watering his cattle, and which right is denied him by the defendant. Difficulties of this kind are generally serious in their character, and often embarrassing in their adjustment. A stream of water is not only of the highest utility to a farmer, but it is also pleasant and cheerful to the eye. The case involves no privileges connected with a mill or mill seat; the stream is small, and its only use is for domestic and agricultural purposes. I have felt it my duty to look with care into this case, as well from my great respect for the feelings of the parties, who I perceive have it much at heart, as to satisfy them that the conclusion to which I have come has been attained upon sound and well established principles.

The complainant, by his bill, charges, that for many years he owned and occupied a farm of one hundred acres, about half a mile south of the defendant's, and which being destitute of water, proved a severe inconvenience. That an opportunity presenting itself, in the year eighteen hundred and thirty-five, he purchased the farm lying between him and the defendant, of one hundred and twenty-two acres, and that a principal inducement was to possess himself of a stream of water running from the defendant's land. That the defendant is the owner and in possession of the adjoining farm, over which there is an

ancient water-course flowing from the Spruce Run turnpike, on to the complainant's land. That this stream was flowing there when the complainant purchased the last tract, commonly called the Creveling farm, and was always theretofore accustomed to flow in its natural channel.

The complainant states that he has bought other lands, and repaired and improved the buildings; and especially in reference to this water, has put up long lines of board fence, and made lanes on his place leading to it, as a permanent watering place for his horses and cattle. The stream is said to have disappeared for a short time in a sink-hole, but by ditching along the line of the stream and the reflow of the water, it again revived and returned to its ancient channel. The use of this water is declared to be indispensable, and the want of it to render the complainant's farm and improvements comparatively worthless.

After thus describing the situation of the parties, and their lands, the grievances are thus stated :—That the defendant, about two years before, dug a ditch near the partition line between the two farms of the complainant and defendant, and so near to the place where the water run, as to endanger its breaking away and carrying it down the new ditch on the defendant's side ; and observing that such would be the result, the complainant sent to the defendant and caused him to fill it up with stones and turn the stream back. That upon doing this, he informed the complainant of his determination to take the water from its channel near the turnpike road, and lead it down to his house, and that he has actually commenced digging a drain for that purpose, and dammed up the ancient water-course, and turned a portion of the water into such new drain.

The prayer of the bill is, that an injunction may issue, restraining the defendant from thus diverting this ancient stream of water. The bill being verified, an injunction was ordered, in conformity with its prayer. The terms of the injunction are broad enough to cover any diversion of the water, but from the scope of the bill, it is quite manifest, it was only intended

to apply to the water flowing from the turnpike, and not to the ditch near the partition line. That had already been put at rest, by the act of the defendant, in turning back the stream, and it was doubtless introduced into the bill to show the aggravated character of the defendant's conduct.

To this bill the defendant answered, and has placed his defence on the broad ground, that the stream in question is not an ancient water-course, and therefore the complainant has no right to it. The defendant states, that he purchased his farm and moved on it in the year eighteen hundred and thirty-one, and that at that time this stream did not run on his land at all, except in times of freshet, when it would flow not only on to him, but his neighbors. That the stream, prior to that time, came down no farther than Wyer's farm, which is the third farm above his, and there disappeared in a sink-hole. That in the year eighteen hundred and thirty-two, observing his neighbors above ditching, he dug a ditch across his own land, and pushed the water through the fence on the adjoining farm, now owned by the complainant. The defendant admits that he dug a ditch along the partition fence, but denies that it was done from any improper motive, but to carry off the surplus water in time of freshets. He also admits the digging of the ditch near the turnpike, and his intention to turn the water down to his house for domestic purposes, and to lead it through drains to water his meadows. The defendant further complains, that just before the service of the injunction, the water was turned back into the former channel; and he insists upon his right to make the ditch, and to use the water in the way proposed.

This statement shows the position of the case, and that the parties are at issue on a question of legal right. There has been a mass of evidence taken, unexampled in the court, and the cause is brought to a final hearing on the merits.

The first consideration that presents itself, and which was fully discussed on the argument, relates to the power of a court of equity over such a case.

Upon the case made by the bill, I had no doubt at the time,

[Shields v. Arndt.]

and have none now. The jurisdiction of this court is of a pre-ventive character in cases of waste and nuisance, and comes in aid of the courts of law. It has long been exercised, and with great usefulness. It is founded on the necessity created by an irreparable mischief, and the inadequacy of pecuniary compensation.

The right to have water flow in its accustomed channel, is an acknowledged principle, for a breach of which the party injured may have his redress by suit at law, and in many cases by injunction. No mere pecuniary compensation will answer the ends of justice, and if the design is discovered in time, be-fore the nuisance is carried into effect, may and should be re-strained. The elementary treatises are full of cases of this character, and they will be found sustained by authority: *Fon-blanque's Equity*, 3, in notes; *Angel on Water-courses*, 75; 1 *Vesey, sen.* 476, 543; 2 *Vernon*, 390; 2 *John. Chan.* 164; *Saxton*, 192.

But it was not so much against the general jurisdiction of the court, that the objection is raised, as to its exercise, when the defendant, as in this case, denies the complainant's right. It is the province of this court, as the defendant's counsel insist, not to try this right, that belonging alone to a court of law, but to quiet the possession whenever that right has been ascertained and settled. If it be intended to say, that a defendant setting up this right by his answer, thereby at once ousts this court of jurisdiction, I cannot assent to it, for it would put an end, very much, to the exercise of an important branch of the powers of the court. This question of right to water is often a very de-bateable matter, and it would be quite easy for a defendant to satisfy his conscience in his own favor. If it be intended to go no further, than that it is a question which should be sent to law in cases of doubt, and often should before injunction be first there established by trial and judgment, then I agree to the proposition. A long enjoyment by a party of a right, will en-title him to restrain a private nuisance, even though the defend-ant may deny the right, and the court will exercise its discre-

21*

tion whether to order a trial at law or not, always inclining to put the case to a jury if there be reasonable doubt. In the case cited from 2 *John. Chan.* the chancellor refused to send the question of right to be tried at law, saying it was clear enough; and a case is cited from *Prec. in Ch.* 530, where a plaintiff who had long been in possession of a water-course, was quieted by injunction, though he had not established his right at law.

We must then look at the case on its merits, and there are a few plain and well settled principles that must control it. Water must be allowed to run in its accustomed channel, and may be used by all the riparian owners through whose lands it may run, but it must be so used as not to deprive those lower down on the stream, of its use in the way which they have been accustomed to use it. There is, however, a length of time, and which in England and in this state is twenty years, in which any particular use of water, or diversion from its accustomed channel, if undisturbed and uninterrupted, will raise the presumption of a grant. It is said, too, and upon the same reason, that as twenty years' possession will give a right, so a nonuser for the like term will put an end to it. This subject will be found very clearly discussed in 3 *Kent's Com.* 353, and in *Angel on Water-courses,* 70. What constitutes a water-course, should also be well settled, and must be kept in mind, in looking into the evidence in this case. Many of the witnesses evidently call a declivity into which the water must run, if there be water, a water-course, and all their opinions are expressed upon that idea. One of them, upon being asked what he meant by a water-course, says, where it would run if there was water to run; others say they consider it an ancient water-course because it is a place where in a freshet it would run. This is the prevailing view taken by the witnesses, and they are correct, so far as they describe the course that the water would flow; but when speaking of a water-course, something more is intended. There must be water as well as land, and it must be a stream usually flowing in a particular direction: it need not flow con-

tinually; many streams in the country are at times dry. There is a wide difference, however, and the distinction is well known, between a regular flowing stream of water, which at certain seasons is dried up, and those occasional bursts of water, which in times of freshet or melting of snows, descend from the mountains and inundate the country.

Carrying with me these principles, and which I believe indisputable, I have looked into this evidence, and after some labor, come to a conclusion upon it, entirely satisfactory to my own mind. In such a volume, it could not be otherwise, than that there should be much discrepancy. It will always be so, where it depends on matter of opinion, or where the occurrences are of ancient date. And yet I am not disposed to think, after a second reading, that there is as much actual difference as I supposed, though there is some of the evidence utterly irreconcilable with any other than the view given. In all such cases the court must be governed by the weight of evidence, after placing upon it all the most charitable construction for the witnesses. Nor have I so much doubt on which side this is, as to think it proper to send the case down for a trial at law. Indeed, the evidence is all here, and I feel that I should meet it and decide upon it. The conclusion to which I come is, that the complainant has failed to show his right in the stream in question, as an ancient water-course. That whatever might have been the original course of this water, there has elapsed a period of more than twenty years, during which it has been detained on the farms above, and upon which a grant may be presumed.

The term of twenty years, in New-Jersey, limits the action of ejectment, and bars the right of entry on lands. The same principle applies to the present case. The evidence, even upon the complainant's side, would leave much doubt upon this part of the case; for many of the witnesses, and particularly Aaron Myers, Frederick Medagh, William H. Lane, Adam Rinehart, John Late, Luther C. Carter, Jacob Myers, John Parke, and John Scott, all confine the running of the water over the turnpike, to freshets. Added to these, the evidence of the defend-

[Shields v. Arndt.]

ant is entirely satisfactory, and must be so, I think, to any im-
partial mind, of the true state of the facts. These witnesses,
many of them, were the former owners and occupants of the
farms now belonging to these parties; men that ploughed and
reaped on the very spot now called the water-course.

Colonel William McCullogh formerly owned those farms, and
that more than forty years ago; his son, William B. McCul-
logh, lived there with his father, and was often over the land;
Captain Henry, forty years ago, lived for twelve years on the
defendant's farm; John Skinner lived two years on the com-
plainant's place, twenty-six years ago; Abraham Woolston has
known those farms since seventeen hundred and eighty-eight;
James Groff lived on defendant's farm twenty-nine years ago;
John Fisler worked the defendant's farm, fifty years ago; Wil-
liam Hazlett worked for captain Henry, on his place, thirty-
five years ago; William M. Creveling lived on complainant's
place in eighteen hundred and seventeen, and continued four
years; Imla Drake lived on complainant's place five years,
thirty years ago; Benjamin Reigle owned the Reigle farm in
eighteen hundred and twenty-nine; and Peter Wyer lived on
complainant's place for ten years, and left it only eight years
ago. Such witnesses ought, surely, to know what was the
condition of this water, and from the venerable and excellent
character of some of them, ought to have our fullest credit and
confidence. They, one and all, testify that there never was, to
their knowledge, any stream of water running across the Spruce
Run turnpike, on to the defendant's land, except in times of
freshet. They go further, many, if not all of them, and de-
clare, that along the place where the supposed water-course is,
they raised grain, and regularly ploughed and reaped. The
water is stated to have sunk on Wyer's farm, and not to have
descended to any of the farms below. They further say, that
there was no watering place formerly where complainant now
has one, but that the cattle on both the complainant's and de-
fendant's farms were watered near the complainant's house,
where there is still a good supply of water. It will be perceived

that this evidence covers a period of more than thirty years, in which the water never run, except in freshets, on to the defendant's land, and down to about eight years last past. There are many other equally respectable witnesses to the same purport, but these are selected as having superior means of knowledge. A man that has lived on and worked a place, has much greater opportunities of knowing every thing that appertains to it, than a mere passer by. The evidence of judge Robeson, who owns the turnpike, is also in accordance with this view. Besides, there is the positive testimony of James Vannata, and the deposition of Berlin Metler, corroborating the defendant's answer, that in eighteen hundred and thirty-two they assisted in digging the ditch, through which the water has since run on to the complainant's land.

This is the commencement, as I think, from the whole evidence, at any rate for the last forty or fifty years, of any regular stream passing on the complainant's land. This can confer no right on the complainant, unless it had continued for a period of twenty years. He had no right to turn the water there without the complainant's consent, and the defendant exposed himself to an action for so doing ; but I can see no principle of law that can prevent his taking it away again, and turning it in any direction, at any time within the term of twenty years. I cannot fail to remark, that much of the confusion in the testimony, has appeared to me to arise from two causes, in not distinguishing whether, when the water run, it was a time of freshet or not, and from the fact that water did run, and more formerly than now, from springs on this same lot of the defendant's, to the complainant, and to this same spot along the partition fence.

There are one or two other suggestions in the case, that I should notice.

The water is said to be of very great importance to the complainant, and none to the defendant. This, it is obvious, if true, cannot enter into the decision ; the right must be settled irrespective of the wants of the parties. I confess, that if I felt

[Shields v. Arndt.]

myself in the position of a mediator, so great do I consider the complainant incommoded by the loss of this water, I would strenuously urge upon the defendant, the propriety and justice, as among neighbors, of allowing a portion of it still to run to the complainant's watering place.   It is my duty to settle the rights, and leave subject of accommodation to the parties themselves.

The complainant is charged with having improperly used the process of this court, by causing the water to be turned from the new ditch into the old channel, on the very day the sheriff came down, and immediately thereafter serving the injunction.   The evidence gives color to such a suspicion.   From the character of the complainant, I cannot believe, if it was so, he was actuated by any other belief, than that he might lawfully do it.   To guard against any such course for the future, I must express my decided disapprobation of it, and my present conviction, that if made known, I should have felt constrained not only to correct the evil, but to dissolve the injunction absolutely and entirely.

As to costs, I have concluded, after some hesitation, to let each party pay his own.   There are two reasons which induce me to this course; one is, that the defendant may be said to have occasioned this controversy, by leading the water, many years ago, on to the complainant's land, and thereby prompted him to make his new arrangements for watering his cattle ; the other is, the great and unnecessary expense of witnesses, so exorbitant on both sides, as to make me desire, in any result, that each party should pay for his own, and indeed, I doubt the propriety of charging it against the adversary.   There have been examined between one hundred and thirty and one hundred and forty witnesses, when a much smaller number, and perhaps a very few, well selected, would have disclosed the true nature of the case.   The bill must, therefore, be dismissed, but without costs.

Decree accordingly.